UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA ) | |
| for the use and benefit of ) | |
| ENDICOTT CONSTRUCTORS CORP., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 14-12807-LTS |
| ) | |
| v. ) | |
| ) | |
| E. AMANTI & SONS, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
[Docket Nos. 54, 55]

June 1, 2017

Boal, M.J.

In this action, plaintiff Endicott Constructors Corp. ("Endicott") asserts claims for breach of contract and quantum meruit based on a subcontract it entered into with defendant E. Amanti & Sons, Inc. ("Amanti") for a construction renovation project at the Veteran Affairs Medical Center in Bedford, Massachusetts. Endicott also asserts a claim against defendant Safeco Insurance of America ("Safeco") under the Miller Act, 40 U.S.C. § 3133. Amanti has filed a counterclaim against Endicott alleging breach of contract, quantum meruit and unjust enrichment. Docket No. 10. Defendants have moved for summary judgment. Docket Nos. 54, 55.[1] The Court heard oral argument on May 31, 2017. For the following reasons, the Court recommends that the District Judge assigned to this case grant in part and deny in part Amanti's

_____

[1] On January 7, 2016, the District Court referred this case to the undersigned for full pretrial proceedings, including report and recommendation on dispositive motions. Docket No. 23.

motion and grant Safeco's motion.

I.     FACTS[2]

     A.     The VA Project

On or about August 30, 2010, Amanti entered into a contract (the "General Contract")

with the United States of America, acting by and through the Department of the Army (the

"Army"), whereby Amanti agreed to perform work on the following project: Renovate Wards

78F, 78G, and 2C; Department of Veterans Affairs Medical Center; Bedford, Massachusetts;

Contract No. W912WJ-10-C-0021 (the "VA Project").[3]  The original amount of the General

Contract was $6,067,400.[4]

On or about September 17, 2010, Amanti entered into a subcontract (the "Subcontract")

with Endicott, whereby Endicott agreed to perform certain work on the VA Project as identified

in the Subcontract and the contract documents between Amanti and the Army.[5]  The original

amount of the Subcontract was $3,707,397.[6]  The Subcontract and its attached Exhibit B identify

the allocation of responsibility and contract funds as between Amanti and Endicott with respect

---

[2] Because this case is before the Court on a motion for summary judgment, the Court sets out any disputed facts in the light most favorable to Endicott, the non-moving party.  See Ahern v. Shinseki, 629 F.3d 49, 53-54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)).  The facts are taken from the Concise Statement of Undisputed Facts in Support of E. Amanti & Sons, Inc.'s and Safeco Insurance Company of America's Motions for Summary Judgment (Docket No. 58) ("Def. SOF"); Plaintiff's Response to Defendants' Concise Statement of Facts (Docket No. 78) ("Pl. Resp."); and Concise Statement of Facts for Defendants' Motions for Summary Judgment, Including Plaintiff's Responses and Defendants' Replies (Docket No. 81) ("Def. Reply").

[3] Def. SOF ¶ 1; Pl. Resp. ¶ 1.

[4] Def. SOF ¶ 1; Pl. Resp. ¶ 1.

[5] Def. SOF ¶ 2; Pl. Resp. ¶ 2.

[6] Def. SOF ¶ 2; Pl. Resp. ¶ 2.

to Amanti's contract with the Army for the VA Project.[7]

Endicott undertook to complete work under 49 discrete specification sections.[8]  As set forth in Exhibit B to the Subcontract, Amanti's responsibility was limited to:  "(a) Specification § 22 00 70:  Plumbing, Health Care Facility; (b) Specification § 23 00 00:  Air Supply Distribution, Ventilation and Exhaust Systems; (c) bond; and (d) insurance (Amanti)."  Endicott was responsible for general conditions and all of the items of work that were not Amanti's responsibility.[9]

Article 13 of the Subcontract provides that "Subcontractor shall make any claims for extra costs within seven (7) calendar days of the occurrence giving rise to such extra costs."[10] Article 13 also provides that "[Endicott] shall only be entitled to receive from [Amanti] the amount of compensation actually received by [Amanti] from the Owner, if any, on account of [Endicott's] work and/or alleged extra costs."[11]

The Army issued a Notice to Proceed to Amanti on October 5, 2010, and extended the start period to October 29, 2010.[12]  Endicott internally identified the VA Project as its Job

---

[7] Def. SOF ¶ 3; Pl. Resp. ¶ 3.

[8] Def. SOF ¶ 4.

[9] Def. SOF ¶ 4.  Endicott disputes Defendants' Statement of Facts Nos. 4 and 5 as "deliberately misleading."  Pl. Resp. ¶¶ 4, 5.  However, Endicott's response does not in fact identify any evidence that would create a genuine issue of fact.

[10] Def. SOF ¶ 6.

[11] Def. SOF ¶ 7.  Endicott acknowledges that the quoted language appears in the contract.  Pl. Resp. ¶¶ 6-7.  Nevertheless, Endicott "disputes" these statements of fact.  Id.  It is not clear how the material cited by Endicott or its arguments are material or responsive to Defendants' statements regarding the contents of the Subcontract.

[12] Def. SOF ¶ 8; Pl. Resp. ¶ 8.

Number 119.[13]  At the conclusion of the Project, the total amount of the adjusted General

Contract was $8,752,137.89.[14]

Before Endicott entered into the Subcontract, Endicott prepared worksheets depicting the

expected cost of each section of work and a schedule for how long it would take to perform the

work.[15]  Endicott maintains that its cost estimate and pre-contract schedule are confidential, and

it refused to produce them in discovery.[16]

Endicott was responsible for preparing and updating the schedule for the VA Project.[17]

Amanti maintains that Endicott's baseline schedule contained no days of "float" for critical path

activities.[18]  According to Amanti's expert, the critical path of the VA Project ran through

Building 78 and all scheduled activities for Building 78 had no float.[19]  Endicott disputes that its

---

[13] Def. SOF ¶ 9; Pl. Resp. ¶ 9.

[14] Def. SOF ¶ 10.  Endicott acknowledges that the final figure for the project was $8,752,137.89 but states that this figure was not arrived at the conclusion of the project but approximately one year later, in August 2015.  Pl. Resp. ¶ 10.  Endicott states that the Project was substantially complete as of April 29, 2014 and the final prime contract figure was apparently negotiated in August 2015.  Id.  It is not clear how this response is material to the facts at issue here.

[15] Def. SOF ¶ 11.

[16] Def. SOF ¶ 11.  In just one sentence, Endicott argues that these worksheets are inadmissible as evidence under the parole evidence rule.  Pl. Resp. ¶ 11.  Endicott, however, has not developed this argument.  Therefore, it is deemed waived for purposes of this motion.  See Redondo-Borges v. United States Dep't of Housing and Urban Dev., 421 F.3d 1, 6 (1st Cir. 2005) (citation omitted) ("Few principles are more sacrosanct in this circuit than the principle that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'").

[17] Def. SOF ¶ 12.  Endicott has not specifically responded to this statement and, therefore, it is deemed admitted.

[18] Def. SOF ¶ 12.

[19] Def. Reply ¶ 12.

schedule contained no days of float and maintains that substantially all of the work in phase 1 of the VA Project contained 25 days of float for each activity.[20]  Amanti argues, however, that the 25 days of float were for Building 2, which was not part of the critical path.[21]

Amanti maintains that Endicott was several months behind schedule from the early stages of the Building 78 portion of the VA Project, and that the delay was not attributable to actions or conditions outside of Endicott's responsibility.[22]  Endicott disputes that any delays were attributable to its actions.[23]

Endicott did not finalize a subcontract with its abatement subcontractor, ECSI, until approximately November 26, 2010.[24]  Abatement of Ward F & G in Phase 1 of the VA Project did not begin until December 29, 2010, (instead of November 22, 2010, as planned) and was not completed until March 10, 2011 (instead of December 6, 2010, as planned).[25]  Endicott made its hazardous material abatement submittals three weeks after the deadline on the baseline schedule.[26]  The Army rejected the late abatement submittals, without challenge from Endicott.[27]  Endicott's baseline schedule only allowed the Army fifteen working days to review and approve

---

[20] Pl. Resp. ¶ 12.

[21] Def. Reply ¶12.

[22] Def. SOF ¶ 13.

[23] Pl. Resp. ¶ 13.

[24] Def. SOF ¶ 14; Pl. Resp. ¶ 14; Def. Reply ¶ 14.  Defendants' statement of fact 14 actually states that the date was November 26, 2016.  However, this appears to be a mistake.  The correct date is November 26, 2010.  See Docket No. 58-2 at 14.

[25] Def. SOF ¶ 14; Pl. Resp. ¶ 14.

[26] Def. SOF ¶ 15; Pl. Resp. ¶ 15.

[27] Def. SOF ¶ 15; Pl. Resp. ¶ 15.

critical submittals, and did not provide any time for resubmittal and re-review of submittals that were not initially approved.[28]

Amanti maintains that several portions of the VA Project commenced late and/or were completed beyond the agreed-upon dates.[29]  Endicott does not appear to dispute the dates cited by Amanti but takes the position that any delays were beyond its control.[30]

B.    Project Management

Thomas V. Kostinden, Chris Cormier, Amanda Frangioso and Melissa Jacobs provided Endicott's home office support.[31]  They were not paid by Endicott, however, because they worked for TLT Construction.[32]  Chris Cormier was Endicott's vice-president, and he signed the Subcontract on behalf of Endicott.[33]

Endicott's direct field personnel included a project manager, a superintendent, a quality control coordinator, carpenters and laborers.[34]  Kostinden personally directed the work of the

---

[28] Def. SOF ¶ 16; Pl. Resp. ¶ 16.

[29] Def. SOF ¶¶ 17-22.

[30] Pl. Resp. ¶¶ 17-22.  When asked at oral argument whether there was evidence in the record to support this assertion, counsel for Endicott could not succinctly identify such evidence and instead stated that this was an open issue for trial.  However, Endicott cannot create an issue of fact without citing to competent evidence of record.  See Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 338 (1st Cir. 1997) ("[T]he material creating the factual dispute must herald the existence of 'definite, competent evidence' fortifying the plaintiff's version of the truth.  Optimistic conjecture . . . or hopeful surmise will not suffice.").

[31] Def. SOF ¶ 23; Pl. Resp. ¶ 23.

[32] Def. SOF ¶ 23; Pl. Resp. ¶ 23.

[33] Def. SOF ¶ 23; Pl. Resp. ¶ 23.

[34] Def. SOF ¶ 24; Pl. Resp. ¶ 24.

project manager, superintendent and quality control personnel.[35]

Pursuant to the Subcontract, Endicott was responsible for supplying the project manager for the VA Project.[36]  Shane Peterson was the project manager for the VA Project.[37]  Initially, all of the direct field personnel were on Endicott's payroll.[38]  Within approximately one month of the start of the VA Project, the Army required that management personnel be put on the prime contractor's payroll (i.e., Amanti) as required by federal regulations.[39]  In or around mid-2011, Peterson took over as project manager and was immediately placed on Amanti's payroll.[40]  Peterson was subject to Endicott's direction and control, even though he was on Amanti's payroll as required by the Army.[41]  He was supervised by Kostinden and Cormier.[42]  Endicott, however, now takes the position that as of September 9, 2012, Peterson was under the direction and control of Amanti.[43]  However, the evidence cited by Endicott does not actually support its position.  Indeed, in his deposition, Kostinden[44] referred to Peterson as "my project manager" and testified that Peterson was merely on the payroll for Amanti but reported to him, took

---

[35] Def. SOF ¶ 24; Pl. Resp. ¶ 24.

[36] Def. SOF ¶ 25; Pl. Resp. ¶ 25.

[37] Def. SOF ¶ 26; Pl. Resp. ¶ 26.

[38] Def. SOF ¶ 26; Pl. Resp. ¶ 26; Def. Reply ¶ 26.

[39] Def. SOF ¶ 26; Pl. Resp. ¶ 26.

[40] Pl. Resp. ¶ 26.

[41] Def. SOF ¶ 26; Pl. Resp. ¶ 26.

[42] Pl. Resp. ¶ 26.

[43] Pl. Resp. ¶ 26.

[44] Kostinden was Endicott's Rule 30(b)(6) designee.

direction from him, and had to answer to him.[45]  Kostinden also testified that he micromanaged Peterson after October/November 2012.[46]

      As of October/November 2012, Kostinden perceived that Peterson was not doing his job.[47]  Peterson was an ineffective manager, failed to attend staff meetings, and failed to cooperate with Endicott's subcontractors.[48]  In October/November of 2012, Kostinden told Peterson he was not doing his job.[49]  Endicott did not replace him, however, because Kostinden believed Peterson would be able to "turn things around."[50]

      Peterson's performance did not change significantly, and as of January 2013, Peterson was not providing the oversight and help that Endicott needed.[51]  Peterson was not doing his job, and Endicott refused to help him.[52]

      Endicott was responsible for keeping track of and documenting who was working on the VA Project every day.[53]

      C.    <u>Endicott's Problems With Subcontractors</u>

      Amanti made payments to Endicott's subcontractors, and Endicott did not object to

---

[45] Def. Reply ¶ 26.

[46] Def. Reply ¶ 26.

[47] Def. SOF ¶ 27; Pl. Resp. ¶ 27.

[48] Def. SOF ¶ 27; Pl. Resp. ¶ 27.

[49] Def. SOF ¶ 28; Pl. Resp. ¶ 28.

[50] Def. SOF ¶ 28; Pl. Resp. ¶ 28.

[51] Def. SOF ¶ 29; Pl. Resp. ¶ 29.

[52] Def. SOF ¶ 29; Pl. Resp. ¶ 29.

[53] Def. SOF ¶ 30; Pl. Resp. ¶ 30.

payments being made in this manner.[54]

Cormier stated that Peterson left the VA Project on the back burner and that Endicott's mason was over two months late in his arrival at the job site.[55]  Endicott also complained to the flooring subcontractor, CJM, that it "continually failed to deliver their contractual flooring scope within the dates of this contract and as per subsequent commitments."[56]

Endicott complained to its millwork subcontractor, Architectural Casework and Millwork ("ACM"), that it "continually failed to deliver their contractual millwork scope within the dates of this contract and as per subsequent commitments."[57]   In addition, it complained to its subcontractor, Thompson Company, Inc., that "you are now delinquent with your replacement doors in order for us to turn over Ward 78F.  Please be advised that Thompson … will be charged the field office overhead for this project for the delay of turn over."[58]

Endicott notified its electric subcontractor, Brite-Lite, that it needed to immediately resolve an issue arising from the use of unapproved materials "so as not to delay the project anymore then [sic] necessary."[59]

Endicott's masonry subcontractor, A-1 Masonry, failed to properly install masonry walls because it did not "tie off" rebar as required by the specifications.[60]   This failure required the

---

[54] Def. SOF ¶ 31; Pl. Resp. ¶ 31.

[55] Def. SOF ¶ 32; Pl. Resp. ¶ 32; Def. Reply ¶ 32.

[56] Def. SOF ¶ 33; Pl. Resp. ¶ 33.

[57] Def. SOF ¶ 34; Pl. Resp. ¶ 34.

[58] Def. SOF ¶ 35; Pl. Resp. ¶ 35.

[59] Def. SOF ¶ 36; Pl. Resp. ¶ 36.

[60] Def. SOF ¶ 37; Pl. Resp. ¶ 37.

removal and reinstallation of concrete blocks.[61]  This failure also delayed the VA Project and

impacted the work of Brite-Lite and Optimum, other subcontractors of Endicott.[62]

     D.     <u>Endicott's Abandonment Of The VA Project</u>

On December 12, 2012, Peterson told the Army that Endicott's "request for equitable

adjustment was not justified and that it was grossly overstated."[63]  Endicott abandoned the VA

Project on May 10, 2013, which is the last day that VA Project records show Endicott laborers at

the jobsite.[64]  As of the end of May 2013, there was still work that was part of Endicott's scope

of work that was not completed.[65]

Amanti maintains that Endicott's payment application for the period ending May 31,

2013 indicated that it valued the remaining work to finish the VA Project at $1,08,716.22.[66]

According to Amanti, this payment application reflects that Endicott was approximately 67%

complete with its adjusted Subcontract scope of work and had 33% remaining.[67]  Payment

---

[61] Def. SOF ¶ 37; Pl. Resp. ¶ 37.

[62] Def. SOF ¶ 37; Pl. Resp. ¶ 37.

[63] Def. SOF ¶ 38; Pl. Resp. ¶ 38.

[64] Def. SOF ¶ 39.  Endicott disputes that it abandoned the project in May 2013.  However, it has cited to no evidence of record that it performed any work on site after May 9, 2013.  Endicott suggests that there was an agreement between Endicott and Amanti that Amanti would finish the VA Project and the parties would have to do an accounting after the fact to allocate payment for the work but the deposition testimony cited does not in fact support this allegation.  Docket No. 73 at 1-2, 5.  Indeed, Kostinden admitted that no agreement on this point was ever reached.  <u>See</u> Deposition of Thomas Kostinden at 137-138.

[65] Def. SOF ¶ 40; Pl. Resp. ¶ 40.

[66] Def. SOF ¶ 42.

[67] Def. SOF ¶ 42.

Application 19 reflects that Endicott had been overpaid for work through the end of May 2013.[68]

Endicott disputes that it was overpaid for work performed as of May 31, 2013.[69] According to Endicott, the negative balance on the application form was a result of deductive charges in the sum of $507,841.59 based upon the transfer of supervision from Endicott to Amanti and the lack of payment for extended performance, through May 31, 2013.[70]

Upon Endicott's abandonment of the VA Project, the Army refused to fund the VA Project until Amanti could demonstrate continued performance of Endicott's subcontractors.[71] Amanti also had to demonstrate to the Army that these subcontractors had been paid appropriately in accordance with the Army's funding of the VA Project to date.[72]  This caused a six month interruption in Project funding and required Amanti to make payments to Endicott's subcontractors to assure their continued performance on the Project.[73]

E.     Extent Of Incomplete Work By Endicott's Subcontractors As Of May 2013

Endicott prepared Subcontractor Disbursement Sheets to track the status of work performed by its subcontractors.[74]  The Subcontractor Disbursement Sheets kept track of: (1) the

---

[68] Def. SOF ¶ 42.

[69] Pl. Resp. ¶ 42.

[70] Pl. Resp. ¶ 42.  This response is difficult, if not impossible, to decipher.  When pressed to explain, after citing some exhibits, Endicott's counsel stated that he did not want to try the case by affidavit at this point.

[71] Def. SOF ¶ 46.

[72] Def. SOF ¶ 46.

[73] Def. SOF ¶ 46.  Endicott states that it disputes the allegations in paragraph 46 of Defendants' statement of facts but the narrative provided is not responsive to paragraph 46.

[74] Def. SOF ¶ 47; Pl. Resp. ¶ 47.

payments that were made and to be made to Endicott's subcontractors; and (2) how much work the subcontractors had completed.[75]   Endicott updated the Subcontractor Disbursement Sheets on a monthly basis.[76]

If a subcontractor performed work, and if Endicott made a payment to a subcontractor, the Subcontractor Disbursement Sheets would reflect that information.[77]   Kostinden does not know if he has seen any Subcontractor Disbursement Sheets post-dating May 2013.[78]

The Subcontractor Disbursement Sheet for Alltech Waterproofing & Restoration ("Alltech") provides an example.[79]   Endicott entered into a subcontract with Alltech for $21,350 to perform three line items of thermal and moisture protection work.[80]   As of May 31, 2013, Alltech was 70% complete with its base subcontract work.[81]   Alltech was also 90% complete with certain change order work on that date.[82]   Amanti made some of the payments to Alltech for the work Alltech performed under its subcontract with Endicott.[83]   Endicott was also holding $2,897.20 from the money Alltech had earned under its subcontract.[84]

---

[75] Def. SOF ¶ 47; Pl. Resp. ¶ 47.

[76] Def. SOF ¶ 47; Pl. Resp. ¶ 47.

[77] Def. SOF ¶ 48; Pl. Resp. ¶ 48.

[78] Def. SOF ¶ 48; Pl. Resp. ¶ 48.

[79] Def. SOF ¶ 49; Pl. Resp. ¶ 49.

[80] Def. SOF ¶ 49; Pl. Resp. ¶ 49.

[81] Def. SOF ¶ 50; Pl. Resp. ¶ 50.

[82] Def. SOF ¶ 50; Pl. Resp. ¶ 50.

[83] Def. SOF ¶ 50; Pl. Resp. ¶ 50.

[84] Def. SOF ¶ 50; Pl. Resp. ¶ 50.

As of May 31, 2013, the status of subcontractor work was as follows:

- Architectural Casework and Millwork, Inc. was only 38% complete with its $100,000 base subcontract.  Architectural Casework failed to supply materials to the job, so Endicott replaced them with Micieli Contracting. The amount of the Micieli subcontract was $60,500 and Micieli was only 36% complete as of May 31, 2013.[85]

- Brite Lite Electrical was only 81% complete with its base subcontract work. Brite Lite's change order work was far less than 100% complete.  The value of Brite Light's subcontract was $713,906.62, but Brite Lite had been paid only $484,706.36 as of May 31, 2013.  Amanti paid Brite Lite more than $109,000 by May 31, 2013, even though they were a subcontractor to Endicott. The Division 26 Electrical Work was 81% complete.[86]

- CJM Services, Inc. was 31% complete with its work on ceramic tile, resilient flooring and carpet.  The Division 9 Finishes Work was only 61% complete.[87]

- Construction Specialties, Inc. was 80% complete with its work on wall and corner guards.[88]

- The Division 10 Specialties Work was only 37% complete.[89]

- The work on visual display boards was only 24% complete, and Amanti had made the sole payment for that work (Endicott had not paid for any of that work).[90]

- Environmental Compliance Specialties had completed its work, but the Army had rejected certain resilient flooring work because stains were bleeding through the newly installed floor.  Endicott withheld more than $24,000 from ECS because of this issue and Endicott does not know if the problem was ever resolved.  Endicott was also holding more than $14,000 of retainage as well as $5,000 due to a fire alarm pull.[91]

- GEM Mechanical Services, Inc. was 86% complete with its base contract work on

---

[85] Def. SOF ¶ 51; Pl. Resp. ¶ 51.

[86] Def. SOF ¶ 52; Pl. Resp. ¶ 52.

[87] Def. SOF ¶ 53; Pl. Resp. ¶ 53.

[88] Def. SOF ¶ 54; Pl. Resp. ¶ 54.

[89] Def. SOF ¶ 55; Pl. Resp. ¶ 55.

[90] Def. SOF ¶ 56; Pl. Resp. ¶ 56.

[91] Def. SOF ¶ 57; Pl. Resp. ¶ 57.

fire protection.  The Division 21 Fire Suppression Work was only 86% complete.[92]

- J. Sallese & Sons, Inc. was 83% complete with its work on toilet accessories and metal lockers.[93]

- Middlesex Glass was 100% complete with its glazing work, but the Division 8 Openings work was only 62% complete.[94]

- M.J. Murphy & Sons, Inc. had not yet started its roofing work.[95]

- North East Foam Solutions, Inc. was 15% complete with its base subcontract work on thermal and moisture protection.  The overall Division 7 Thermal and Moisture Protection Work was only 55% complete.[96]

- Optimum Building Systems was 74% complete with its base contract work.  Some of Optimum's change order work was complete, but most change items were not complete, and several of those items were at 0% complete.[97]

- Pal Painting & Construction Services, LLC was 35% complete with its base subcontract work and had not started its change order work.[98]

- Principal Construction Group was 33% complete with its base subcontract work on doors and hardware and Endicott's Subcontractor Disbursement Sheet shows it was "replacing sub for non-performance."[99]

- Roman Iron Works, Inc. was 100% complete with its structural steel work, but Division 5 Metals Work was only 88% complete.[100]

- Thompson Company, Inc. was 62% complete with its base subcontract work. Thompson's change order work items varied form 22% - 100% complete.  Endicott

---

[92] Def. SOF ¶ 58; Pl. Resp. ¶ 58.

[93] Def. SOF ¶ 59; Pl. Resp. ¶ 59.

[94] Def. SOF ¶ 60; Pl. Resp. ¶ 60.

[95] Def. SOF ¶ 61; Pl. Resp. ¶ 61.

[96] Def. SOF ¶ 62; Pl. Resp. ¶ 62.

[97] Def. SOF ¶ 63; Pl. Resp. ¶ 63.

[98] Def. SOF ¶ 64; Pl. Resp. ¶ 64.

[99] Def. SOF ¶ 65; Pl. Resp. ¶ 65.

[100] Def. SOF ¶ 66; Pl. Resp. ¶ 66.

was also holding back $25,000 because of Thompson's deficient work.  Endicott does not know if this issue was ever resolved, or whether it ever paid this money to Thompson.[101]

As of May 2013, there were numerous deficiencies that had been identified by Endicott's superintendent and quality control representative, as well as the Army's inspector.[102]  These deficiencies overwhelmingly related to work items within the scope of work of Endicott and its subcontractors.[103]  Many of the deficient items had been identified months before Endicott left the VA Project.[104]

F.    Amanti's Forced Assumption Of Endicott's Obligations

Pursuant to the Subcontract, Endicott was required to enlist, coordinate, oversee and pay the subcontractors it chose to rely upon to perform the work other than HVAC and plumbing work (mechanical work) on the VA Project.[105]  Because Endicott abandoned the VA Project as of May 10, 2013, Amanti was left to coordinate, oversee and pay Endicott's subcontractors to complete the work.[106]

The Subcontract called for Endicott to provide "general conditions" throughout the VA Project.  Endicott's Job Cost Summary lists the tasks that it included in general conditions.[107] The general conditions included providing the project manager, the superintendent, the quality

[101] Def. SOF ¶ 67; Pl. Resp. ¶ 67.

[102] Def. SOF ¶ 68; Pl. Resp. ¶ 68.  While Endicott disputes that it abandoned the VA Project as of May 2013, it has not disputed the remaining allegations in paragraph 68.

[103] Def. SOF ¶ 68; Pl. Resp. ¶ 68.

[104] Def. SOF ¶ 68; Pl. Resp. ¶ 68.

[105] Def. SOF ¶ 69; Pl. Resp. ¶ 69.

[106] Def. SOF ¶ 69, Pl. Resp. ¶ 69.

[107] Def. SOF ¶ 70; Pl. Resp. ¶ 70.

15

control representative, preparing the original schedule and the schedule updates, attending job site meetings, coordinating subcontractors, pricing change orders, providing a job site trailer and equipping the trailer with appropriate office equipment.[108]  Amanti maintains that due to its abandonment of the project, Endicott did not complete the general conditions it had planned at the beginning of the VA Project, including protecting and cleaning floors, dumpsters, final cleanup, window washing, GC trailer contents, GC copier, first aid, job photos, as-builts, elevator protection, and cutting and patching.[109]  Endicott acknowledges that it did not perform these general condition items after August 3, 2013 but it notes that almost half of the work performed after that date was the performance of extra work for which Amanti was paid by the Army along with delay and disruption impacts.[110]

Following Endicott's abandonment of the VA Project, the activities that Amanti had to perform – and which should have been performed by Endicott – included but were not limited to:

- Coordinating Endicott's (former) subcontractors on a daily basis.

- Making payments to the subcontractors Endicott had hired to perform the Endicott scope of work.  This process included inspection of these subcontractors' work, review of their requisitions, negotiation of adjustments, and resolving discrepancies between the perceived extent of the subcontractors' completed work from the perspective of the subcontractors themselves as compared to the Army's Project inspectors as well as Amanti's personnel.

- Assuming responsibility for an on-site Quality Control Manager responsible for documentation of inspections, daily reports, and assurance that approved materials were being installed on the Project by all subcontractors.

- Preparing daily reports covering the work of all trades, including the Project staffing and work by subcontractors who did not perform plumbing or HVAC work.

---

[108] Def. SOF ¶ 71; Pl. Resp. ¶ 71.

[109] Def. SOF ¶ 71.

[110] Pl. Resp. ¶ 71.

- Cleaning the site, taking out trash, maintaining construction areas, and maintaining construction fences on a daily basis.

- Assuming responsibility for jobsite safety for non-plumbing and non-HVAC trades, including running weekly safety meetings.

- Erecting and dismantling temporary protection for construction activities.

- Identifying conflicts between and among the work of subcontractors, the design, and the Army, and coordinating the resolution of these conflicts.

- Preparing meeting minutes for Project meetings with the Army and its consultants

- Holding weekly foreman meetings to coordinate all Project subcontractors.

- Maintaining and updating the Project schedule for review by the Army.

- Preparing and negotiating change order requests by and for subcontractors who did not perform plumbing or HVAC work.

- Preparing, tracking and distributing submittals, test reports, inspection reports and other documentation for subcontractors who did not perform plumbing or HVAC work.

- Creating, distributing and confirming completion of items on deficiency lists and punch list work completed by subcontractors who did not perform plumbing or HVAC work.

- Creating voluminous operation and maintenance manuals for Project components other than plumbing and HVAC components, such as operation and maintenance manuals for the electrical subcontractor, the fire protection subcontractor, the painting subcontractor, ceiling subcontractor, flooring subcontractor, glazing subcontractor, and the doors and hardware subcontractor.

- Amanti had to oversee and coordinate replacement of tile floors that were stained from mastic bleeding through.  Old mastic was supposed to be abated by Endicott's abatement subcontractor and the floors were installed by Endicott's flooring subcontractor.  Endicott's abandonment of the Project after the deficient workmanship of its subcontractors meant that Amanti had to determine the solution for the problem and coordinate, oversee and pay for the extensive corrective work. This corrective work required evacuation of one of the wards at the medical center.

- Painting portions of the Project that the painting subcontractor selected by Endicott

did not paint.[111]

Amanti ultimately paid $2,587,152.13 to subcontractors and suppliers for labor and materials that were part of Endicott's subcontract obligations.[112]  It also incurred $1,171,062.84 for its own employees to perform work that was part of Endicott's obligations under the Subcontract, such as for general conditions, non-mechanical labor, and field management.[113]  In addition, Amanti incurred $378,629.52 for home office overhead due to Endicott's abandonment.[114]  Amanti also paid $17,494.50 for temporary heat and temporary protection—requirements of Endicott under the Subcontract.[115]

      G.    Endicott's Alleged Intent To Complete Early

Endicott claims it initially planned to finish the VA Project by September 9, 2011, well before the March 17, 2012 completion date identified in the Subcontract.[116] Endicott prepared its baseline schedule after it entered into its Subcontract with Amanti, and before it entered into its subcontracts with its own subcontractors.[117]   Endicott did not share its plan to complete its

---

[111] Def. SOF ¶ 72.  Endicott states that substantially all of these tasks continued to be performed by the same personnel on Amanti's payroll from the Fall of 2010 through the end of the VA Project in April 2014 but does not cite to any evidence to support this assertion.

[112] Def. SOF ¶ 73.

[113] Def. SOF ¶ 74.

[114] Def. SOF ¶ 75.

[115] Def. SOF ¶ 76.  Endicott disputes these figures but it has not presented sufficient evidence to create a genuine issue of fact.  Endicott's denial is largely unresponsive and/or is based on counsel's arguments, as opposed to citing evidence.

[116] Def. SOF ¶ 77; Pl. Resp. ¶ 77.

[117] Def. SOF ¶ 78; Pl. Resp. ¶ 78.

Subcontract work early with the subcontractors it retained to actually perform the work.[118]

Endicott never sent its baseline schedule indicating a September 9, 2011 finish date or any

schedules to its subcontractors.[119]

      H.    <u>Government Time Extensions</u>

      Through Contract Modification A0012, dated June 28, 2013, the Army agreed to extend

the Contract completion date 228 calendar days to August 3, 2013.[120]  The Army determined that

the VA Project achieved Substantial Completion on April 29, 2014.[121]

      I.    <u>Endicott's Payment Applications</u>

      Endicott prepared Payment Application No. 19 for the period through May 31, 2013.[122]

As of May 31, 2013, Endicott had been overpaid $32,510.73 and it still had more than

$1,000,000 worth of work left to complete.[123]  A comparison of Endicott's Job Cost Summary

with the amount that Amanti has already paid to Endicott shows that Endicott has been paid in

full for the labor, materials, equipment and supervision it provided, directly and through

subcontractors.[124]  Endicott's Job Cost Summary dated March 21, 2014, shows total costs of

---

[118] Def. SOF ¶ 79; Pl. Resp. ¶ 79.

[119] Def. SOF ¶¶ 80-81; Pl. Resp. ¶¶ 80-81; Def. Reply ¶ 81.

[120] Def. SOF ¶ 82; Pl. Resp. ¶ 82.

[121] Def. SOF ¶ 83; Pl. Resp. ¶ 83.

[122] Def. SOF ¶ 84.

[123] Def. SOF ¶ 84.  Endicott disputes this assertion but it is not clear how Endicott's response actually contradicts Amanti's assertion.

[124] Def. SOF ¶ 85.

$2,655,005.57.[125]

The Job Cost Summary includes some costs that Endicott did not pay, however, such as:

 a. Site Super Bldg 78: $223,986.59
 b. Site Super Bldg 2: $26,818.20
 c. CQC Manager: $143,412.00
 d. Project Manager: $164,729.85[126]

The Job Cost Summary also includes several entries for items other than payments to provide labor, materials, equipment or supervision for the work:

 a. Overhead and Profit: $490.96
 b. E. Amanti Legal: $6,238.41
 c. Pending Backcharges: $33,466.54
 d. Accrued Expenses: $2,192.87[127]

The items that Endicott did not pay, or that do not qualify as labor, materials, equipment or supervision, total $601,335.42.[128]  Deducting this amount from the identified total costs of $2,655,005.57, leaves $2,053,670.15.[129]  It is undisputed, however, that Amanti paid Endicott $2,150,349.92.[130]  Thus, Endicott's receipts are higher than its costs for the VA Project.[131]

 J. Endicott's Time Related Claims

Endicott claims entitlement for performance related costs through August 3, 2013, the

---

[125] Def. SOF ¶ 85.  Here, again, Endicott disputes the statement but it is not clear from the response how the cited evidence contradicts Amanti's assertions.

[126] Def. SOF ¶ 86; Pl. Resp. ¶ 86.

[127] Def. SOF ¶ 87; Pl. Resp. ¶ 87.

[128] Def. SOF ¶ 88.

[129] Def. SOF ¶ 88.

[130] Def. SOF ¶ 88.

[131] Def. SOF ¶ 88. Again, Endicott disputes the assertions in paragraph 88 but does not cite to any evidence to contradict it and its arguments are undecipherable.

extended completion date the Army agreed to in Contract Modification A0012.[132]  On March 20, 2014, Endicott submitted a claim notice alleging that Amanti owed it $1,022,750.12.[133]

Endicott's claimed damages fall into four categories:

| | | |
|---|---|---|
| 1. | Alleged Unpaid Subcontract Balance: | $256,779.67 |
| 2. | Alleged Claim for 326 "Compensable" Days | $683,771.96 |
| 3. | Alleged Claim for 143 "Not Compensable" Days | $299,936.78 |
| 4. | Alleged Claim for "Early Completion" 225 Days | $471,928.50[134] |

The claims in items 2 through 4 above are "time related" or "extended performance" claims and total $1,455,637.[135]  Endicott acknowledged that Amanti was entitled to a credit of $689,666.79 against the extended performance claims, thereby reducing Endicott's claimed damages in this lawsuit to $1,022,750.12.[136]

Endicott's delay claims are broken down into periods of 326 days, 143 days and 225 days.[137]  Endicott does not know when these delay periods occurred during the VA Project.[138]

---

[132] Def. SOF ¶ 89; Pl. Resp. ¶ 89.

[133] Def. SOF ¶ 90.

[134] Def. SOF ¶ 90.

[135] Def. SOF ¶ 90.

[136] Def. SOF ¶ 90.  Endicott disputes that it has acknowledged that Amanti is due a credit of $689,667.79 but (1) it appears that this number comes from Endicott's own claim letter to Amanti; and (2) the documents cited do not appear to contradict this assertion.  At oral argument, Endicott's counsel pointed to Exhibits 73-79.  However, these exhibits are not cited in Endicott's response to Def. SOF ¶ 90.  Counsel then suggested that the Court look to its response to paragraph 88 because it was referenced in Endicott's response to Def. SOF ¶ 90.  It is not.  Rather, paragraph 89 is.  In any event, none of these items, clearly and without explanation, support Endicott's claim.  Indeed, one of them is the March 20, 2014 letter that Amanti uses to support its claim.

[137] Def. SOF ¶ 92.

[138] Def. SOF ¶ 92.

Endicott does not know the basis for the distinction between the alleged 326 compensable days and the alleged 143 non-compensable days.[139]  When questioned about how Endicott developed its clam that it was entitled to 326 days of compensable time, Kostinden simply responded "I'm going to have to research that one.  I can't answer that right now."[140]

Endicott claims home office overhead costs based on payments Endicott made to a company called TLT, but Endicott did not produce any documents reflecting those expenses.[141] Endicott asserts that Amanti was fully aware that administrative functions for Endicott were being handled by TLT employees, but never asked for any TLT documents in regard thereto.[142] Endicott has not explained why it believes it is entitled to compensation for 143 days of time that the Army found to be non-compensable.[143]

K.    Endicott's Alleged Costs For Field Office/General Condition Costs

In its Job Change Order Requests #28 and #39, Endicott identified its field office/general conditions costs to be $85.86 per day.[144]  In its damages claim submitted to Amanti on March 20, 2014, Endicott identified its field office/general conditions costs to be $198.57 per day, which is

---

[139] Def. SOF ¶ 92.  Again, Endicott disputes Amanti's assertions.  However, on the face of Endicott's response, the number of days does not add up.  In addition, there is no evidence cited to support Endicott's distribution of 326 compensable days versus 143 non-compensable days. See Def. Reply ¶ 92.

[140] Def. SOF ¶ 93; Pl. Resp. ¶ 93.

[141] Def. SOF ¶ 95; Pl. Resp. ¶ 95.

[142] Pl. Resp. ¶ 95.

[143] See Def. SOF ¶¶ 96-99; Pl. Resp. ¶¶ 96-99.

[144] Def. SOF ¶ 100.

$112.71 more than the $85.86 per day claim in the Job Change Order Requests.[145]  Endicott

maintains that the $85.86 figure was a figure submitted by Amanti and that Endicott's figure was

submitted in March 2012 in the amount of $198.57.[146]  The evidence cited for this proposition,

however, does not support Endicott's assertions.[147]

       L.      <u>Endicott's Failures To Pay</u>

One of Endicott's subcontractors, Pal Painting & Construction Services, LLC ("PAL"),

sued Endicott due to Endicott's non-payment.[148]  PAL also asserted claims against Amanti and

Amanti's surety pursuant to the Miller Act.[149]  Amanti paid PAL and obtained a $39,174.30

judgment against Endicott as result of its payment.[150]

Endicott employees and the United States Department of Labor asserted a claim that

Endicott's employees were not paid an appropriate wage in connection with the VA Project.[151]

At Endicott's request, Amanti paid $10,585.72 to the Department of Labor to resolve the

dispute.[152]

       M.      <u>The Aberdeen Proving Ground Project</u>

On or about October 19, 2009, Amanti, as subcontractor, entered into a subcontract ("the

---

[145] Def. SOF ¶ 100.

[146] Pl. Resp. ¶ 100.

[147] <u>See</u> Pl. Resp. ¶ 100.

[148] Def. SOF ¶ 101; Pl. Resp. ¶ 101.

[149] Def. SOF ¶ 101; Pl. Resp. ¶ 101.

[150] Def. SOF ¶ 101; Pl. Resp. ¶ 101.

[151] Def. SOF ¶ 102; Pl. Resp. ¶ 102.

[152] Def. SOF ¶ 102; Pl. Resp. ¶ 102.

Aberdeen Proving Ground Subcontract") with Endicott, as contractor, for a project known as Joint SATCOM Engineering Center, C4ISR Campus, Aberdeen Proving Ground, Maryland; Contract No. W912BU-09-C-0048 ("the Aberdeen Project").[153]  Amanti agreed to perform certain plumbing, HVAC and mechanical work as more specifically defined in the Aberdeen Proving Ground Subcontract.[154]

Amanti performed all of its work on the Aberdeen Project and the government paid Endicott in full for Amanti's work.[155]  Endicott's contract with the government is open on the Aberdeen Project because the government is not satisfied with the as-built drawings that Endicott submitted on that project.[156]  Amanti had nothing to do with Endicott's obligation to provide as-built drawings.[157]  Endicott is due $11,000 from the government on the Aberdeen Project.[158]  The government is holding those funds to ensure Endicott provides the as-built drawings.[159]

Several years ago, a fire occurred at the Aberdeen Project and Endicott notified Amanti and another subcontractor of the fire and said there could be a claim for property damage.[160]  Endicott acknowledges there has been no such claim.[161]

---

[153] Def. SOF ¶ 103; Pl. Resp. ¶ 103.

[154] Def. SOF ¶ 104; Pl. Resp. ¶ 104.

[155] Def. SOF ¶ 105; Pl. Resp. ¶ 105.

[156] Def. SOF ¶ 106; Pl. Resp. ¶ 106.

[157] Def. SOF ¶ 106; Pl. Resp. ¶ 106.

[158] Def. SOF ¶ 107; Pl. Resp. ¶ 107.

[159] Def. SOF ¶ 107; Pl. Resp. ¶ 107.

[160] Def. SOF ¶ 108; Pl. Resp. ¶ 108.

[161] Def. SOF ¶ 108.  Endicott disputes that there has been no claim for the fire but has presented no evidence to contradict Amanti's assertion.  Kostinden testified that there was no claim. Kostinden Deposition at p. 166.  Endicott appears to suggest Kostinden's deposition testimony

Despite demand, Endicott has refused to pay Amanti for the balance of the Aberdeen Proving Ground Subcontract work, and extra work performed, in the amount of $237,891.12.[162] Endicott acknowledges that Amanti is due $237,891.12 for work performed on the Aberdeen Project.[163]

II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See id. at 324. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

---

may be wrong and cites to Exhibit B to Endicott's initial disclosures. However, the Court is unable to locate that exhibit. At oral argument, the Court asked Endicott's counsel to identify where that exhibit is located in the record but he was unable to do so.

[162] Def. SOF ¶ 109; Pl. Resp. ¶ 109.

[163] Def. SOF ¶ 109; Pl. Resp. ¶ 109.

The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor.  See O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate."  Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

III.    ANALYSIS

A.    Endicott's Material Breach Precludes Its Claims

Amanti argues that there is no genuine issue of fact that Endicott failed to perform its obligations under the Subcontract and, as a result, it is precluded from recovering on both its breach of contract and quantum meruit claims.  Docket No. 60 at 4-7; Docket No. 79 at 2-6. This Court agrees.

"It is well established under Massachusetts law[164] that a contractor 'cannot recover on the contract itself without showing complete and strict performance of all its terms.'"  U.S. Steel v. M. DeMatteo Const. Co., 315 F.3d 43, 48 (1st Cir. 2002) (quoting Peabody N.E., Inc. v. Town of Marshfield, 426 Mass. 436 (1998)).  "Failing complete performance, a contractor 'who in good faith substantially performs a contract may recover in quantum meruit.'"  Id. (quoting J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789 (1986)).  "It is equally well established that 'an intentional departure from the terms of the contract without justification or excuse in matters

---

[164] Where the parties have agreed as to the choice of law, courts are "free to 'forego an independent analysis and accept the parties' agreement.'"  Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16, 20 (1st Cir. 2003) (citation omitted).  Here, all parties have relied on Massachusetts law.

other than those so trifling as to be properly regarded as falling within the rule of de minimis will bar all recovery for materials supplied and work performed.'" Id. (quoting Hayeck Bld. & Realty Co. v. Turcotte, 361 Mass. 785 (1972)); see also PDM Mechanical Contractors, Inc. v. Suffolk Const. Co., Inc., 35 Mass. App. Ct. 228, 230-231 (1993) ("The law has long been settled in this Commonwealth, in relation to building contracts, that a contractor cannot recover on the contract itself without showing complete and strict performance of all its terms, but that, failing in such complete performance of the contract, he may recover on a quantum meruit, if he can prove both substantial performance of the contract and an endeavor on his part in good faith to perform fully, and the burden is upon him to prove both.").

Endicott acknowledges that, pursuant to the Subcontract, it was required to "act as the general contractor" and to "provid[e] most of the trade subcontractors." Docket No. 67 at 2-3. The Defendants have provided evidence that Endicott walked off the job on or around May 10, 2013, with more than $1 million worth of its scope of work left to do.[165] While Endicott disputes that it abandoned the VA Project in or around May 2013, it does not actually point to any evidence to contradict this assertion.[166] Indeed, Endicott has admitted that it "stepp[ed] away from active participation in the Project."[167] It also admitted that it walked away at least by

---

[165] See Def. SOF ¶¶ 39, 42, 45; Def. Reply ¶ 39.

[166] In several instances, Endicott disputes a fact alleged by the Defendants but it fails to cite to any evidence or the evidence cited does not actually contradict the statement of fact. In other instances, Endicott's attempts to identify disputed issues of fact are incomprehensible. It is not the Court's duty to scour the record in search of a genuine issue of triable fact. See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 79 (1st Cir. 2014) ("[I]n the summary judgment context . . . we are not 'pigs [] hunting for truffles' in the record.'").

[167] Pl. Resp. ¶ 45.

August 2013.[168]  In addition, it has admitted, by virtue of not contesting those statements of material fact, that many of its subcontractors breached their obligations to perform work that was the responsibility of Endicott and/or had not completed work that was the responsibility of Endicott as of May 2013.[169]  Further, in the same manner, Endicott has admitted that as of May 2013, there were numerous deficiencies related to work items within the work scopes of Endicott and its subcontractors.[170]  Finally, Endicott failed to pay federally-required wages to its own employees, such that the Department of Labor required Amanti to make-up the shortfall.[171]  These facts show that Endicott did not substantially perform its contract obligations, which precludes any recovery on Endicott's claims for breach of contract and quantum meruit.

In an apparent effort to avoid summary judgment, Endicott suggests that it was in a joint venture with Amanti and that, at some point in the summer of 2013, Amanti requested to take over Endicott's portion of the work.  Docket No. 73 at 1-2, 5; see also Docket No. 71 at 2.  However, Endicott has not presented any evidence to support its joint venture theory and, in any event, has also failed to explain how a joint venture would change the outcome.  Endicott has also failed to present any evidence that Amanti agreed to take over Endicott's work in the summer of 2013.  Indeed, Endicott's Rule 30(b)(6) designee admitted at his deposition that that no agreement on this point was ever reached.[172]

Endicott also argues that its own Project Manager, Shane Peterson, was adverse to it.

---

[168] See Pl. Resp. ¶ 71.

[169] Def. SOF ¶¶ 32-37, 47-67; Pl. Resp. ¶¶ 32-37; 47-67.

[170] Def. SOF ¶ 68; Pl. Resp. ¶ 68.

[171] Def. SOF ¶ 102; Pl. Resp. ¶ 102.

[172] See Kostinden Deposition, Exhibit 58-21, at 137-138.

Docket No. 73 at 4-5.  According to Endicott, starting in or around September 2012, Peterson was actually under Amanti's direction and control.  Id. at 5.  Again, Endicott fails to point to any evidence in support of its claims.  As referenced above, Kostinden testified that he personally directed Peterson's work at all times.[173]

Finally, Endicott appears to argue that it was relieved of its obligations because there was a "cardinal change" to the VA Project.  Docket No. 73 at 2, 10.  As a preliminary matter, it is not clear that the cardinal change doctrine has been adopted by Massachusetts courts.  See XL Specialty Ins. Co. v. Commonwealth, No. 08-4095-BLS, 2012 WL 3139874, at *8 (Mass. Super. July 12, 2012); but see Turner Constr. Co. v. MJ Flaherty Co., Civil Action No. 13-2308 (Mass. Super. Mar. 7, 2017).[174]  In any event, a cardinal change occurs only "when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for."  PCL Const. Servs., Inc. v. United States, 96 Fed. Appx. 672, 677 (Fed. Cir. 2004) (citations omitted).  Changes that "merely extended or altered specifications, timeline, or cost of the original work" are not cardinal changes.  XL Specialty Ins. Co., 2012 WL 3139874, at *8.  In support of its cardinal change argument, Endicott points only to the fact that the Army required supervisory personnel to be placed on Amanti's payroll and that the VA Project required over 60 job changes.  Docket No. 73 at 10.  However, Endicott has not explained how the placement of supervisory personnel on Amanti's payroll altered the scope of the work.  Moreover, the number of changes alone, without any evidence that the scope of those changes drastically altered the scope of the contract, is not sufficient to make the cardinal change doctrine applicable to this case.  See, e.g., In re Boston

---

[173] Def. Reply ¶ 26.

[174] Endicott has submitted a copy of this decision at Docket No. 88-1.

Shipyard Corp., 886 F.2d 451, 456 (1st Cir. 1989) (86 change orders not sufficient to show a cardinal change to construction contract).

Accordingly, the Court finds that Endicott has failed to raise a genuine issue of fact that it failed to substantially perform its obligations under the Subcontract and, therefore, it is not entitled to recover on its breach of contract and quantum meruit claims against Amanti.

B.     Endicott's Extended Time Claim

Because the Court has found that Endicott has failed to raise a genuine issue of fact that it is precluded from recovering on its breach of contract and quantum meruit claims, it is not necessary to address Amanti's argument that Endicott has failed to present any evidence to support its extended time claim, which is comprised of planned early completion, compensable delays, and non-compensable days.  Nevertheless, the Court finds that Endicott has failed to raise genuine issues of material fact regarding this claim.

First, Amanti argues that Endicott's failure to provide expert testimony is fatal to its extended time claim.  Docket No. 60 at 7-9; Docket No. 79 at 11-12.  It is not clear that Endicott is required to provide expert testimony on this subject in order to prove this claim.  See, e.g., Allstate Interiors & Exteriors, Inc. v. Stonestreet Const., LLC, 907 F. Supp. 2d 216, 248 (D.R.I. 2012) (finding that no particular expertise, other than familiarity with the facts, was required to calculate days of construction delays).  However, "establishing the existence of a trialworthy issue requires 'more than simply show[ing] that there is some metaphysical doubt as to the material facts.'"  Dialogo, LLC v. Bauza, 456 F. Supp. 2d 219, 224 (D. Mass. 2006) (quoting Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)).  Instead, Endicott "must present 'enough competent evidence' to permit a rational trier of fact to find in its favor.'"  Id. (citing Forestier Fradera v. Mun. of Mayagez, 440 F.3d 17, 21 (1st Cir. 2006)).

Endicott has failed to point to particular evidence and to provide a coherent analysis in such a way that the Court can determine whether a trier of fact could find in its favor on the extended time claims.[175]

In addition, Endicott has failed to show any evidence that it complied with the Subcontract's notice provision for extra cost claims.  Paragraph 13 of the Subcontract provides that "Subcontractor shall make any claims for extra costs within seven (7) calendar days of the occurrence giving rise to such extra costs."[176]  A subcontractor's failure to comply with the notice and claims provisions of the contract will generally preclude all relief.  See Glynn v. City of Gloucester, 9 Mass. App. Ct. 454, 461-462 (1980).  "Were it otherwise, the contractual [] framework for the resolution of disputed claims would be virtually meaningless."  Glynn v. City of Gloucester, 21 Mass. App. Ct. 390, 398 (1986).

Endicott first provided written notice to Amanti of alleged damages arising from its extended time claims on March 20, 2014.[177]  It is incumbent upon Endicott to point to specific evidence showing that it complied with the notice requirement.  It has not done so.

Accordingly, the Court finds that Endicott has failed to raise a triable issue on its

---

[175] Endicott suggests that the Court review the construction schedules and consider them "with what actually occurred on the Project, namely changed conditions and interruptions of the work that mandated numerous revised schedules."  Docket No. 73 at 16.  However, "[i]t is not the obligation of the Court to play the role of plaintiff's advocate, or to scour the record for evidence supporting a theory when plaintiff himself has neglected to do so."  Bolduc v. Town of Webster, 629 F. Supp. 2d 132, 139 (D. Mass. 2009).

[176] Def. SOF ¶ 6; Pl. Resp. ¶ 6.

[177] Def. SOF ¶ 90.

extended time claim.[178]

      C.      Amanti's Counterclaims

      1.      Aberdeen Project

Amanti has brought a counterclaim against Endicott for moneys allegedly owed in the Aberdeen Project.  Docket No. 10.  It is not disputed that Amanti fully performed its subcontract work in the Aberdeen Project, Endicott was fully paid for the work Amanti performed, and Endicott failed to pay Amanti its outstanding subcontract balance of $237,891.12.[179]  While the government is holding $11,000 from Endicott pending receipt of satisfactory as-built drawings, Amanti had nothing to do with the as-built drawings in question.[180]

Endicott does not dispute that it owes Amanti $237,891.12 for the Aberdeen Project.[181] Rather, it appears that Endicott is arguing that it need not pay Amanti until a government claim regarding a fire in a heating unit installed by Amanti is resolved.[182]  However, Endicott has not pointed to any evidence that any such claim is actually outstanding.  It has also provided no legal analysis supporting its argument that it need not pay Amanti until any such claim is resolved. Accordingly, the Court recommends that the District Court grant summary judgment in favor of Amanti on its Aberdeen Project breach of contract counterclaim.[183]

---

[178] Amanti makes other arguments in support of its motion for summary judgment with respect to Endicott's extended time claims.  Docket No. 60 at 10-17.  In light of the Court's findings in this section, it is unnecessary to address those arguments.

[179] Def. SOF ¶¶ 105, 109; Pl. Resp. ¶¶ 105, 109.

[180] Def. SOF ¶ 107; Pl. Resp. ¶ 107.

[181] Def. SOF ¶ 109; Pl. Resp. ¶ 109.

[182] See Pl. Resp. ¶ 108.

[183] In addition to breach of contract, Amanti brings claims for quantum meruit and unjust enrichment in connection with the Aberdeen Project (Counts III and IV).  Because the Court has

2.      The VA Project

Amanti has also brought a counterclaim for breach of contract on the VA Project.  In the introduction to its memorandum of law, Amanti states that it seeks summary judgment on this claim as well in the amount of $155,769.04.  Docket No. 60 at 2.  However, Amanti has not addressed this counterclaim in its memorandum of law, particularly as it relates to its calculation of damages.  Accordingly, the Court recommends that the District Court deny Amanti's motion for summary judgment as it relates to its counterclaim for breach of contract on the VA Project.

D.      Endicott's Miller Claim Against Safeco

Endicott has brought a claim under the Miller Act against Safeco.  Docket No. 1 at 4-5. The Miller Act requires the principal contractor on a government project to post a payment bond in order to protect suppliers of labor or material.  U.S. ex rel. Auburn Door & Hardware, LLC v. Suffolk Const. Co., Inc., No. 10-11074-DPW, 2013 WL 5329214, at *2 (D. Mass. Sept. 19, 2013) (citations omitted).  Because a lien cannot attach to federal property, the Miller Act was enacted to provide subcontractors and suppliers on federal construction projects an alternative remedy by allowing suppliers to make a claim against the bond.  See id.; U.S. ex rel. Maris Equip. Co., Inc. v. Morganti, Inc., 163 F. Supp. 2d 174, 179 (E.D.N.Y. 2001).

Safeco issued a Miller Act payment bond on behalf of Amanti as principal.  Safeco has moved for summary judgment on Endicott's Miller Act claim on two grounds.  First, Safeco argues that Endicott's claim is barred by the applicable statute of limitations.  Docket No. 59 at 2-3.  Second, Safeco argues that Endicott may not recover on the bond because Endicott

---

found that Amanti is entitled to judgment in its favor on its breach of contract claim, it cannot recover on its quantum meruit and unjust enrichment claims.  See Fernandes v. Havkin, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) ("A claim of unjust enrichment . . . is 'not available to a party with an adequate remedy at law.'").

materially breached its Subcontract with Amanti. Id. at 3.

      1.      Endicott's Miller Act Claim Is Barred By The Statute Of Limitations

The Miller Act contains a one year limitations period. Specifically, it provides that "[a]n action brought under this subsection must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." 40 U.S.C. § 3133(b)(4).

Here, the Defendants have provided evidence that Endicott abandoned the VA Project on May 10, 2013.[184] As discussed above, Endicott has pointed to no evidence disputing that assertion. Endicott did not file this action until June 30, 2014, over one year after it abandoned the VA Project. Thus, Endicott's Miller Act claim is untimely.

Endicott argues that its Miller Act claim is timely based on allegations that Endicott supplied on-site trailers and supervisory personnel past May 2013. Docket No. 71 at 2-3. First, the mere presence of trailers previously supplied and rented by Endicott does not extend the limitations period past the date on which it actually performed work on the VA Project. See, e.g., Safe Environment of Am., Inc. v. Employers Ins. Of Wausau, 278 F. Supp. 2d 121, 126 (D. Mass. 2003). Second, Endicott has pointed to no evidence that its own personnel performed any work on the VA Project past May 9, 2013.

Accordingly, the Court finds that Endicott has failed to raise a triable issue of fact that its claims against Safeco are timely.

      2.      Endicott May Not Recover Under The Bond
                  Because Amanti Has No Liability To Endicott

"A suretyship is a contractual arrangement in which one party, the 'surety', agrees to

---

[184] See Def. SOF ¶¶ 39, 42, 45; Def. Reply ¶ 39.

back up the obligation of another, termed the 'principal' or 'principal debtor', the latter bearing the primary burden of performing for the creditor." Rhode Island Hosp. Trust Nat. Bank v. Ohio Cas. Ins. Co., 789 F.2d 74, 77 (1st Cir. 1986) (citations omitted). "[T]he surety is not liable to the creditor unless his principal is liable" and the surety "may plead the defenses which are available to his principal." Id. at 78 (citations omitted). Therefore, "[a] surety's liability under the Miller Act is measured by the general contractor's liability under the construction contract." Consol. Elec. & Mechanicals, Inc. v. Biggs General Contracting, Inc., 167 F.3d 432, 435 (8th Cir. 1999) (citations omitted). Because the Court has concluded that Endicott cannot show that Amanti is liable to it under the Subcontract, then Endicott's claim against Safeco must also fail.[185]

## IV.   RECOMMENDATION

For the following reasons, the Court recommends that the District Judge assigned to this case grant Safeco's motion for summary judgment. In addition, the Court recommends that the District Judge grant in part and deny in part Amanti's motion for summary judgment. Specifically, the Court recommends that the District Judge enter judgment in Amanti's favor on all of Endicott's claims against it and on Amanti's breach of contract counterclaim related to the Aberdeen Project (Count II). If the District Judge adopts the recommendation, then the only claim remaining for resolution at trial is Amanti's breach of contract counterclaim related to the VA Project (Count I).[186]

---

[185] Endicott has not challenged the proposition that if the Court concludes that Amanti has no liability to Endicott under the Subcontract, then it should reach the same conclusion as to Safeco. Indeed, its counsel agreed with this proposition at oral argument.

[186] Amanti has indicated that insofar as Endicott has stated that it is out of business and judgment-proof, Amanti believes that, as a practical matter, it is unnecessary to obtain a

V.    REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any

party who objects to these proposed findings and recommendations must file specific written

objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report

and Recommendation.  The written objections must specifically identify the portion of the

proposed findings, recommendations, or report to which objection is made, and the basis for such

objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court

of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P.

72(b) will preclude further appellate review of the District Court's order based on this Report

and Recommendation.  See Phinney v. Wentworth Douglas Hospital,199 F.3d 1 (1st Cir. 1999);

Sunview Condo. Ass'n v. Flexel Int'l, 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d

343 (1st Cir.1993).

                                        /s/ Jennifer C. Boal
                                        JENNIFER C. BOAL
                                        United States Magistrate Judge

_____

judgment on all claims in order to put an end to this litigation.  See Docket No. 60 at 2, n. 2.
However, when asked at oral argument, Amanti declined to drop this counterclaim.